**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION**

| | | |
|---|---|---|
| **TEKINA RUSSELL NORTHCUTT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **7:12-cv-01721-KOB** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of the Social** | ) | |
| **Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

**I. Introduction**

On August 7, 2008, the claimant, Tekina Russell Northcutt, applied for supplemental security income under Title XVI of the Social Security Act. (R. 138). The claimant alleges disability commencing on February 1, 2006, because of depression, anxiety, and post-traumatic stress disorder, as well as pain associated with cervical spine surgery and a lumbar fusion. (R. 15). The Commissioner denied the claims on November 7, 2008. (R. 67). The claimant filed a request for a hearing before an Administrative Law Judge on December 15, 2008, and the ALJ held a hearing on June 9, 2010. (R. 24). In a decision dated June 30, 2010, the ALJ found that the claimant was not disabled as defined by the Social Security Act, and, thus, was ineligible for supplemental security income. (R. 10). On March 2, 2012, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1). The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Because the ALJ erred in finding claimant's mental limitations to be non-severe, this

court reverses the decision of the Commissioner.

## II. Issue Presented

The claimant presents the following issues for review:

(1) whether substantial evidence supports the ALJ's finding that claimant's depression, anxiety, and post-traumatic stress disorder are non-severe;

(2) whether substantial evidence supports the ALJ's finding that claimant does not have an impairment or combination of impairments that meet or medically equal one of the listed impairments in 20 C.F.R. pt. 404, supbt. P, app. I; and

(3) whether substantial evidence supports the ALJ's finding that claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 416.967(a) with modifications and additional limitations.

Because the court finds that substantial evidence does not support the ALJ's decision regarding issue (1), the court does not reach issues (2) and (3).

## III. Standard of Review

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if he applied the correct legal standards and if his factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g) (2006); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The

court will affirm those factual determinations that substantial evidence supports. Substantial evidence is more than a mere scintilla. It means evidence that a reasonable mind could accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] factual findings." *Walker*, 826 F.2d at 999. A reviewing court not only must look to the parts of the record that support the decision of the ALJ but also must view the record in its entirety and take account of evidence that detracts from the evidence upon which the ALJ relied. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

### IV. Legal Standard

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

(1) Is the person presently employed?
(2) Is the person's impairment severe?
(3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, supbt. P, app. I?
(4) Is the person unable to perform his or her former occupation?
(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

"In sequential evaluation step two, the Commissioner determines whether a claimant has a 'severe' impairment or combination of impairments that causes more than a minimal limitation on a claimant's ability to function." *Davis v. Shalala*, 985 F.2d 528, 532 (11th Cir. 1993). "An impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a); *see also Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). "Basic work activities" include:

> (1) Physical functions such as walking, standing, sitting, lifting, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers, and ususal work situations; and (6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b).

According to the Eleventh Circuit, an impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience. *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986); *see also Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984).

### V. Facts

The claimant has an associates degree in business administration and was thirty years old at the time of the alleged disability onset date. (R. 35, 138). Her past work experience includes work as a waitress, a florist, a collection agent, a sales manager, an office manager, and a substitute teacher. (R. 183). The claimant alleged she was unable to work because of pain in her back and neck, as well as her depression, anxiety, and post traumatic stress disorder. (R. 15).

4

*Physical Limitations*

In February of 2006, claimant was involved in an accident on an amusement park ride at Desoto Caverns Park. A chain broke loose on the ride and hit claimant in the back of the neck, triggering claimant's medical difficulties. (R. 46, 212).

On February 20, 2007, Dr. Charlie J. Talbert performed a cervical spine CT on the claimant. The findings, read by radiologist Dr. Allen Oser, revealed "some contrast material present within the C5-C6 and C6-C7 disc spaces," but no "canal stenosis" or "evidence of focal disc herniation or foraminal encroachment." (R. 274). Dr. Talbert also ordered a three level cervical discography, which produced pain mainly at C4-C5 and to a lesser degree at C5-C6, revealing annular tears posteriorly at C4-C5 and C5-C6. (R. 275).

On March 5, 2007, claimant saw Dr. Talbert, who diagnosed her with cervical disc degeneration. (R. 270). On March 8, 2007, Dr. Talbert performed an anterior cervical diskectomy and fusion at C4-5 and C5-6. He noted that her "cervical MRI films showed degenerative change but nothing severe" but that "she has gotten to the point where she feels something has to be done." (R. 272-73).

On October 3, 2007, claimant saw Dr. Rick McKenzie, a neurosurgeon, for another opinion on Dr. Talbert's recommendation of an artificial disk. Dr. McKenzie reviewed claimant's history, noting her accident at Desoto Caverns and resulting neck pain. He noted that she had a discogram and, subsequently, a two-level cervical fusion at C4-5 and C5-6. According to Dr. McKenzie, claimant's "preop MRI basically shows no evidence of neural impingement whatsoever." He noted that she had "essentially no motion in her neck at all" and that "these radiographs show what I belief to be a pseudoarthrosis or clearly a lucency at her lower fused

5

segment at C5-6." Dr. McKenzie reported that he was in "complete disagreement" with any recommendation to perform further surgery on claimant because she had reported no improvement in her neck pain from the start of surgeries. Dr. McKenzie reported that, overall, "there is going to be very little to do for this patient with regards to treatment and management of her discomfort and . . . no matter what is done this patient will have continued discomfort." At that time, claimant's medications were Prophoxyphne, Ranitidine, Klonopin, Lexapro, and Xanax. (R. 212-13).

On October 15, 2007, claimant returned to Dr. McKenzie with her CT scan of the cervical spine. Dr. McKenzie noted that it had "some areas of lucency associated with her fusion," but he continued to strongly advice against surgery. He stated that he believed claimant was "looking for additional surgery in the hopes that it will get her some degree of improvement." (R. 211).

On October 28, 2007, claimant was involved in a motor vehicle accident. (R. 324).

On January 21, 2008, upon a referral from Dr. Talbert, claimant saw Dr. Thomas J. Kraus for a repeated therapeutic injection. At that visit and again on February 4, 2008, Dr. Kraus performed a fluoroscopic lumbar epidural injection on claimant. (R. 234-35, 248-54). On March 19, 2008, claimant saw Dr. Kraus again for her lower back pain and pain in her right lower extremity. Dr. Kraus diagnosed her with lumbar radiculopathy and possible discogenic pain, but noted that claimant "has no abnormal pain expressions on her face" and "[i]t is somewhat difficult to ascertain the exact pain issues she is undergoing." (R. 233).

Claimant saw Dr. McKenzie again on March 26, 2008. He reviewed her history, noting that she had recently been involved in a car accident and was involved in two active lawsuits. He noted that claimant had "had two blocks" and that, according to claimant, Dr. Tolbert wanted to

perform a lumbar fusion on her. Dr. McKenzie stated:

> The patient's MRI has been over-read. My interpretation is that the most minuscule of disc bulges [is] present. There is minor disc degeneration present. There are no modic end plate signal changes and certainly nothing I believe needs to have surgical intervention. . . . I think if this patent has a lumbar fusion based upon what I have seen thus far would be almost criminal. . . . I believe that this patient is best served treated conservatively without any surgical intervention whatsoever.

(R. 209-10).

On March 31, 2008, claimant received another fluoroscopic lumbar epidural injection from Dr. Kraus. (R. 237). On June 3, 2008, claimant saw Dr. Kraus for lower back pain and cervical neck pain. Dr. Kraus noted that claimant was "more debilitated than she [had] ever been" and diagnosed spine pain with myalgias. He recommended she see Dr. Dan Doleys for a pain rehabilitation program and psychological evaluation. He noted that he would not "write any opiates or medications for her as I am not sure they will be of any significant benefit at this point." (R. 232).

On July 17, 2008, Dr. Talbert performed a lumbar fusion L5-S1 on claimant. (R. 256-57).

In claimant's August 20, 2008 Adult Function Report, she described her daily activities as: "Lay in Bed, sleep, watch TV, sit on porch some." She noted that she gets her children ready for school and helps them with their homework, but that her mother and "Connie" help her with cleaning, cooking, caring for the children, and taking her to the doctor. She reported that she can no longer walk for long, sit for long, clean, cook, or do "quick things" and that she sometimes has to have help dressing, bathing, caring for her hair, and using the toilet because of her difficulties with rasing her arms, bending over, and getting up and down. According to the report, she prepares sandwiches and frozen dinners for herself, drives "only if I have to," shops for

groceries and medicine (for no longer than 30 minutes), and handles the family finances. (R. 155-58).

Claimant noted difficulty remembering whether she had taken her medicine and sometimes misplacing money. As to her social interactions, claimant reported that she sometimes gets so aggravated that she "take[s] things the wrong way." She reported that her conditions affect her lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, hearing, stair climbing, memory, competing tasks, concentration, and getting along with others. She stated that she can walk fifteen to twenty steps before needing to rest for ten to fifteen minutes and that she uses a walker and a cane. She noted that the walker was prescribed by a doctor in the Spring of 2008 because her legs would collapse, but that she had not used it since her surgery. (R. 157-61).

On November 7, 2008, Dr. Gordon Mitchell reviewed claimant's records and performed a physical residual functional capacity assessment of her. He determined that she could occasionally lift or carry 20 pounds, that she could frequently lift or carry ten pounds, that she could stand or walk at least two hours per workday, that she could sit about six hours per workday, and that she was unlimited in her ability to push or pull. He found that she could frequently balance and stoop, occasionally climb ramps or stairs, kneel, crouch, and crawl, and never climb a ladder, rope or scaffolds. He determined that she was limited in her ability to reach in all directions, but had no limitations regarding handling, fingering, or feeling and had no communicative limitations. Dr. Mitchell found that claimant should avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, and vibration and should avoid all exposure to hazards such a machinery, heights, etc. He ultimately determined that "claimant's medically determinable impairment(s) could reasonably be expected to produce some of the stated

symptoms and functional limitations" and found that "claimant's statements about [her] condition to be partially credible." (R. 315-22).

On January 27, 2009, claimant saw Dr. Fred Graham, a physiatrist, for pain management. She reported having been to the ER on two recent occasions for shots to address her increase in symptoms. Dr. Graham prescribed Lyrica, Mobic, Xanax, Cymbalta, and Percocet. (R. 342). On March 4, 2009, claimant saw Dr. Graham again for pain in her neck, right arm, low back and bilateral lower extremities with numbness to her feet. According to Dr. Graham's records, claimant told him that Percocet helps and that she had "recently been bow shooting a lot and would like to continue this." Dr. Graham ordered a "right C5, C6 transforaminal epidural and bilateral S1 transforaminal epidural." (R. 336-37). The epidural occurred on March 6, 2009 and again on April 9, 2009. (R. 334, 339-40).

Claimant returned to Dr. Graham on May 5, 2009, stating that the epidural had helped her leg but not her back. Dr. Graham adjusted claimant's medications, taking her off of Lyrica and putting her on Ultram. At July 28, 2009 follow up visit, claimant reported difficulties sleeping, walking, and standing and rated her pain a "6" on a scale of 1-10. At this visit, as with all previous visits, Dr. Graham noted that other than the noted difficulties, claimant's musculoskeletal system was within the normal limits. He also noted that claimant walked and stood normally, without any limp or instability. (R. 334-36).

On September 16, 2009, claimant underwent a right C5-C6 transforaminal epidural and bilateral S1 transforaminal epidural #2. (R. 338). On October 21, 2009, claimant visited Dr. Graham again, reporting that she had to have some assistance in everyday activities and that the pain caused difficulty in walking and standing at times. Dr. Graham noted that claimant walked

with a cane and an ankle brace and he continued her previous medications, adding a prescription for Nexium. Claimant returned to Dr. Graham on April 28, 2010, reporting the same symptoms. She stated that she had been to the ER recently because her pain was so great. Dr. Graham ordered an MRI of the lumbosacral and cervical spine and noted that he would "write her a letter for disability after he has her MRI." He also gave her an injection in her right shoulder and discontinued her use of Cymbalta. (R. 332-34).

On May 3, 2010, claimant had an MRI. The resulting report stated that claimant had "[u]nremarkable appearing postop anterior fusion changes at C4-C5 and C5-C6" and "[m]ild degeneration of the C6-C7 disc which has occurred since 2007 and is associated with a small posterior disc bulge versus protrusion. This does not appear to affect the neural element. The exam is otherwise unremarkable." (R. 343).

On June 7, 2010, Dr. Graham wrote a letter outlining his treatment of claimant and noting that at that time, she was requiring Xanax, Ultram, and Percocet as much as three times a day, along with Mobic and Cymbalta. He stated that he did not feel like he had been successful in helping claimant and that he was limited to treating, as opposed to curing, her symptoms. He concluded: "Do (sic) to the combination above, I do feel as though [claimant] is unable to maintain gainful employment. I would recommend her for total medical disability." (R. 349).

On August 29, 2010, claimant visited the emergency room, complaining of pain in her left ankle, right knee, right hip, and back because of a fall. (R. 372). She went again on November 8, 2010, complaining of shoulder, hand, and wrist pain because of a fall and noting that Percocet helped the pain. The record notes that she had no swelling or discoloration and that she held her cell phone in her injured hand, but the doctors nevertheless diagnosed her with a

sprained wrist. (R. 362-65). At both ER visits, X-rays came back normal. (R. 364, 374).

On November 11, 2010, claimant visited the emergency room again, complaining of back and neck pain as a result of being hit with fists and slammed to the ground by her father after having a verbal altercation with her step-mother. The nurse noted no obvious trauma to claimant's body. The emergency room doctors ordered a CT scan of claimant's brain, which came back normal, and CT scans of claimant's cervical spine and lumbar spine. Although the radiologist noted that he did not have a comparison available, he made no acute finding on either scan, merely noting the post-surgical change. (R. 356-60).

*Mental Limitations*

On August 15, 2007, claimant saw Dr. Patrick Bruce Atkins, a psychiatrist, who diagnosed her with post traumatic stress disorder, major depression, and chronic pain disorder and prescribed Klonopin and Lexapro. (R. 230). Dr. Atkins saw claimant again on September 5, 2007 and he noted that she was feeling and sleeping better, but unable to do any housekeeping. She tried to ride a four-wheeler but had to stop. (R. 220). Claimant saw Dr. Atkins again on October 3, 2007 and on December 3, 2007, at which time he recommended claimant for pain management for her lumbar disc pain and prescribed Xanax. (R. 219). On, May 6, 2008, claimant told Dr. Atkins she was doing "pretty good" and had had a nerve block in her back. Dr. Atkins noted that she was on Cymbalta, Xanax, and Klonopin at that visit. (R. 215).

On October 10, 2007, claimant saw Charles E. Houston, Sr., PhD, for a mental examination. Dr. Houston diagnosed claimant with major depression (moderate to severe), anxiety disorder, symptoms of post traumatic stress disorder, and chronic pain syndrome. He noted that claimant "is capable of performing her basic daily activities," but also stated that her

11

"activities are moderately to severely restricted." He also noted that she could manage her personal and financial affairs without assistance, concentrate, and adapt to changing conditions. He did state that "[s]he may have some difficulty with total independent functioning. Her ability to meet the demands of competitive employment is affected by her psychiatric condition, and possibly by her physical condition." (R. 297-300).

On November 7, 2008, Dr. Robert Estock performed a psychiatric review of claimant's medical records. Dr. Estock found that claimant had major depression (moderate to severe), symptoms of post traumatic stress disorder, and anxiety disorder. He further noted that claimant had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration. Dr. Estock also reviewed the notes of Dr. Atkins and Dr. Houston. (R. 301-13).

On that same day, Dr. Estock also completed a mental residual functional capacity assessment of claimant. He noted that she was not significantly limited in most areas, but was moderately limited in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, interact appropriately with the general public, and respond appropriately to changes in the work setting. He specifically noted that claimant is "able to comprehend and recall and carry out simple instruction over a 8 hr. workday w/ routine breaks," that she "is able to carry out short and simple instructions [and] concentrate for two hour periods," that her "contact with coworkers, supervisors and the general public should be casual," and that "changes in the workplace should be introduced slowly." (R. 323-25).

12

On January 27, 2009[1], claimant's attorney forwarded to the SSA a letter from Dr. Atkins. In the letter, Dr. Atkins stated that claimant had been in his care since July 18, 2007 and outlined claimant's diagnosis. He listed her impairments as post traumatic stress disorder secondary to February 2005 Desoto Cavern neck injury, major depressive disorder, chronic pain disorder, cervical disc surgery and chronic pain subsequent to injury, and interpersonal, psychological, and occupational impairment. He concluded the letter by stating: "It is my medical opinion [claimant] despite compliant treatment continue (sic) to suffer from these disorder and despite medications and supportive psychotherapy is totally incapacitated from working and her condition is permanent. Furthermore, she manifests no evidence of malingering." (R. 327-28).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for supplemental security income, the claimant requested and received a hearing before an ALJ. (R. 8). At the hearing, the claimant and the ALJ first discussed the onset date of claimant's alleged disability. The ALJ pointed out that claimant alleged a February 1, 2006 onset date, but did not file her application until August 7, 2008. Claimant testified that she had filed a previous application that she had not appealed and the ALJ agreed to look into the matter. (R. 32-33).

Claimant first testified as to her home life, her education, and her work background. (R. 34-36). She then described her accident at Desoto Caverns that caused her neck pain. According to claimant, she was hit in the back of the neck by a chain that popped off of the ride. She originally thought it merely caused a pulled muscle or a bruise, but within the day she could not

---

[1]Although the letter is dated January 27, 2009, it is marked as received on January 31, 2008. The court assumes that the later date is correct. (R. 327).

13

raise her arms up at all. She did not go to the hospital until the next day, but when she did, they gave her pain medicine and sent her home. (R. 36-37). Claimant then testified as to the cause of her back pain, stating that it began when an eighteen-year-old boy rear-ended her car as she was picking up her son from school. She was not hospitalized, but went the next day to Dr. Talbert, the doctor who had previously performed her neck surgery. According to claimant, Dr. Talbert found the bulging disc in her lower back. (R. 37).

Claimant testified that under Dr. Talbert's care, she first tried nerve blocks, then physical therapy, then went on a walker because her "legs would just give out," and finally had to have surgery. The surgery involved the fusion of claimant's L-5 and S-1, which produced some improvement but did not eliminate the pain. After the surgery, claimant was able to walk with a cane, instead of with the walker, which was prescribed by Dr. Talbert. Claimant testified that she used her cane eighty-five percent of the time and only used her walker when "it's just significantly bad." Clamant then described her neck surgery, stating that the doctors fused two different discs, although she was unsure which two. (R. 37-39).

Claimant described her neck and back pain, saying the neck pain radiates through her arms and sometimes makes it difficult to lift her arms and the back pain radiates down her legs. She said the pain was a "10" on a scale of 1-10 without medication, but a "6" when she was on pain medication. According to claimant, her medication affects her ability to focus by making her "loopy" and forgetful. She also said the medication makes her thirsty, makes her sleep a lot, and makes her groggy. (R. 40-41). Claimant then testified as to her psychological problems, testifying that Dr. Atkins has treated her for posttraumatic stress disorder, which she believes is from both of the accidents. Any loud noise scares her and causes a panic attack where she cannot breathe.

14

She also claimed to have anxiety disorder and suffer from depression, which make her feel like a "worthless mother" because she is no longer outgoing and able to do activities with her children. (R. 41-42).

Claimant testified that to alleviate her pain she keeps repositioning herself in the bed or recliner. When asked how long she could sit or stand in a workday before needing to get up, she answered that she could sit for "30 minutes tops," that she could stand for 30 minutes, and that she could possibly walk 25 yard with her cane before having to sit down. She claimed she could not lift over ten pounds, that it hurts to reach above her head, that she falls if she tries to stretch, and that her daughter often has to brush her hair for her. (R. 42-44).

Claimant described her daily routine as mostly lying in bed, but trying to go outside at least once a day to feed her goldfish. She said her children help a great deal with chores, such as dishes and laundry, and that her mother comes down once or twice a week to cook something other than frozen dinners. She testified that her only income came from child support and her son's disability payments. (R. 44-45).

The ALJ then asked claimant about her 2007 cervical fusion. Claimant stated that she got some relief and was able to use her arms before the car wreck. Dr. Talbert was going to perform another neck surgery, but did not do so after the car wreck because claimant had so much other pain and because the wreck messed up another disc that, if fixed, would eliminate the mobility in claimant's neck and make her unable to drive. Claimant stated that at that time she drove some, but not far, and usually only to pick up a few things at Wal-Mart. (R. 46-47).

Claimant then testified that she had not worked since the neck surgery and that she had been involved in lawsuits concerning the Desoto Caverns incident and the car wreck. According

15

to claimant, she did not receive enough money from either settlement to make it worth the "hassle." At that time claimant was receiving child support, but no other assistance and lived in a rental house owned by someone she knows. She took Xanax at night, but no other sleeping pills, and testified that sometimes she can sleep and sometimes she cannot sleep. (R. 47-50).

Claimant listed her current medications as Xanax, Ultram, Percocet, Cymbalta, and Nexium, and said they make her thirsty, groggy, unable to focus, and unable to remember. (R. 50). Claimant concluded her testimony by stating that she had not discussed any more surgeries or physical therapy with her doctors, and that she goes to pain management roughly every three months. (R. 52).

The ALJ then called Mr. Donald Parsons, the vocational expert, who reviewed claimant's past work history. He testified that claimant's skills selling mobile homes were not transferable outside of the industry, that her skills as an office manager would transfer to some sedentary jobs, and that her skills from being a substitute teacher would not transfer to any sedentary jobs. The ALJ then posed a hypothetical to Mr. Parsons, describing a person who could perform a light range of work, lift ten pounds occasionally and less than ten pounds frequently, stand and walk for four hours a day with a sit/stand option, sit for six hours a day, had limited use of the right lower extremity, and could occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, frequently balance, occasionally kneel and crouch, never crawl, and never reach overhead for more than two hours a day. Psychologically, the ALJ described this hypothetical person as having the ability to comprehend and recall, carry out simple instructions over a workday with routine breaks, maintain concentration for two-hour periods, have casual contact with coworkers, supervisors, and the general public, and be in a work setting where changes are

introduced slowly. (R. 52-60).

Mr. Parsons testified that these restrictions would rule out all of claimant's past relevant work, but would allow her to work as a parking lot cashier, a surveillance system monitor, or a document preparer, all of which are significantly represented in the national and state economies. (R. 61). The ALJ then asked about a second hypothetical individual with the same restrictions, but with the ability to understand, remember, and carry out instructions on a complex level. Mr. Parsons testified that this individual would be able to perform claimant's past job as a sales manager. (R. 61-63).

In his third hypothetical, the ALJ described an individual who experiences moderately severe to severe pain and cannot maintain concentration for two-hour periods due to pain medication. Mr. Parson's testified that such an individual would be precluded from competitive work. (R. 63).

The ALJ concluded by asking claimant if she had taken any medications before attending the hearing, to which she responded she had taken her normal morning and midday doses of Percocet and Xanax. (R. 64).

*The ALJ's Decision*

On June 30, 2010, the ALJ issued a decision finding the claimant was not disabled under the Social Security Act since August 7, 2008, the date claimant filed her application. (R. 13). After laying out the applicable law in the case, the ALJ first found that claimant had not engaged in substantial gainful activity since the application date. The ALJ then found that claimant had the severe impairments of cervical surgery and lumbar fusion and the non-severe impairments of situational depression, anxiety, and post traumatic stress disorder. He determined that the mental

17

impairments were nonsevere because they did not cause "more than minimal limitation in the claimant's ability to perform basic mental work activities." (R. 15).

In making this finding, the ALJ considered the four broad functional areas known as the "paragraph B" criteria. In the first area, daily living, the ALJ concluded that "[t]here is no evidence of limitation in this area due to a mental impairment," citing the opinion of Charles E. Houston Sr., Ph.D., an examining physician who noted that claimant was "performing her basic daily activities." In the second area, social functioning, the ALJ determined that claimant had a moderate limitation, citing Dr. Houston's report that her activities were moderately to severely restricted, her interests were mildly constricted, and her ability to relate to others was somewhat affected. (R. 15-16).

In the third area, concentration, persistence, or pace, the ALJ found that claimant had a mild limitation, citing both Dr. Houston's report that claimant was able to concentrate and was persistent and claimant's own testimony that her medications caused problems with concentration, focus, and memory. In the fourth area, episodes of decompensation, the ALJ determined that the "claimant has experienced no episodes of decompensation which have been of extended duration." The ALJ noted that "paragraph B" criteria "are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process." (R. 16).

The ALJ next found that the claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Specifically, he noted that:

[C]laimant's impairment of lumbar fusion does not meet Listing 1.04 because she

does not have one of the listed disorders . . . in conjunction with evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss . . . accompanied by sensory or reflex loss, and, in connection with the lumbar spine impairment, also a positive straight leg raising test . . . .

(R. 16).

Regarding the claimant's residual functional capacity (RFC), the ALJ found that the claimant had the RFC to perform sedentary work with the following modifications: "she can lift and carry 10 ponds occasionally and less than 10 pounds frequently; add a sit/stand option; she can stand and walk 4 hours out of an 8-hour workday; she can sit for 6 hours out of an 8-hour workday; and she experiences mild to moderate pain." In making this finding, the ALJ considered claimant's symptoms and the extent to which they were reasonably consistent with the objective medical evidence, as well as other evidence. He then went through the two-step process of determining whether claimant had an underlying physical or mental impairment that could reasonably be expected to produce her symptoms and then evaluating the intensity, persistence, and limiting effects of those symptoms and the extent to which they limit functioning. (R. 17).

The ALJ briefly reviewed claimant's testimony about her accidents; her surgeries; her use of a cane and walker; her inability to lift her arms; the side effects of her medications; her pain; her ability to sit, stand, walk, and lift; her activities; her treatment plan; and her mental impairments. He found that "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above [RFC]." (R. 17-18).

19

To justify this finding, the ALJ acknowledged claimant's accidents, surgeries, and complaints of pain, but pointed out that "during this time of complaining of debilitation pain she went bow hunting in March 2009 and even stated that she wanted to continue with it." He also referenced her statement that Percocet brings relief to her pain and her testimony that her pain is a level "6" when she is on medication. According to the ALJ, this "is only moderate pain, which indicates that the medication does control pain." (R. 18).

The ALJ looked to the notes of Dr. Graham, claimant's pain management physician, which continually noted claimant's ability to walk and stand normally and her normal range of motion and strength, and only once noted that she "at times" had difficulties standing and walking. He noted claimant's various MRI's and postop notes, which showed no significant disc degeneration or other remarkable complications or abnormalities. The ALJ stated that "[t]hese MRI's indicate that the surgeries were successful," and concluded that he was not persuaded by Dr. Graham's opinion or Dr. Atkins's opinion "to the extent that [they] intend[] to assert complete disability under the Social Security Act." (R. 18).

The ALJ stated that both doctors "seem to have relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported." The ALJ determined, however, that "there exists good reasons for questioning the reliability of the claimant's subjective complaints." He gave "[g]ood weight" to the physical and mental assessments of the State agency medical consultants—Dr. Estock and Dr. Mitchell—and used these assessments as the basis of the RFC, adding appropriate limitations. (R. 18-19).

The ALJ then found that claimant was unable to perform any past relevant work, that she

is a "younger individual" with at least a high school education, the ability to communicate in

English, and some transferrable work skills. Based on the Medical-Vocational Guidelines, the

Dictionary of Occupational Titles and the testimony of the vocational expert, the ALJ determined

that, "although the claimant's additional limitations do not allow [her] to perform the full range

of sedentary work," the claimant has the ability to perform jobs such as parking lot cashier,

surveillance system monitor, and document preparer, all of which are present in significant

numbers in the national and state economies. Thus, the ALJ ultimately found that the claimant

"has not been under a disability, as defined in the Social Security Act, since August 7, 2008, the

date the application was filed." (R. 19-20).

## VI. Discussion

The claimant argues that the ALJ erred in finding that claimant's mental impairments

were non-severe. (Doc. 8, at 2).

The Commissioner must determine "whether a claimant has a 'severe' impairment or

combination of impairments that causes more than a minimal limitation on a claimant's ability to

function." *Davis v. Shalala*, 985 F.2d 528, 532 (11th Cir. 1993). To make this decision, the

Commissioner must look at whether the impairment or combination of impairments

"significantly limit[s] [the claimant's] physical or mental ability to do basic work activities." 20

C.F.R. § 404.1521(a); *see also Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).

"Basic work activities" include:

> (1) Physical functions such as walking, standing, sitting, lifting, pulling, reaching,
> carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3)
> Understanding, carrying out, and remembering simple instructions; (4) Use of
> judgment; (5) Responding appropriately to supervision, co-workers, and ususal
> work situations; and (6) Dealing with changes in a routine work setting.

21

20 C.F.R. § 404.1521(b).

In the Eleventh Circuit, an impairment is not severe "only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986) (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)).

In this case, the ALJ found that "the claimant has a moderate limitation" in the area of social functioning, the second of the four functional areas that the ALJ evaluated. Three paragraphs later, however, he stated that "claimant's medically determinable mental impairments cause no more than 'mild' limitation in any of the first three functional areas." Even the SSA's brief in support of the ALJ's decision acknowledges that "the ALJ based his finding that Plaintiff's mental impairments were not severe on an erroneous assumption that she had no more than mild limitations in the functional areas . . . ." when one of the limitations was actually "moderate." (Doc. 10, at 11).

A moderate limitation in even one of the functional areas brings claimant's impairment above the threshold of causing "more than a minimal limitation on a claimant's ability to function," *Davis*, 985 F.2d at 532, and makes it more than a "slight abnormality" with "a minimal effect," *McDaniel*, 800 F.2d at 1031. The court finds that the ALJ erred in finding claimant's mental impairments non-severe when the moderate limitation is properly considered.

The SSA, while acknowledging the ALJ's error, argues that this court should consider the error harmless because the ALJ continued to consider the claimant's mental impairments in his analysis of subsequent issues. In support of this proposition, the SSA cites to an *unpublished*

Eleventh Circuit case, a district court case from the Middle District of Florida, and an Eleventh Circuit case that merely stands for the proposition that an erroneous statement of fact by an ALJ may be harmless.

In the unpublished Eleventh Circuit case, *Burgin v. Commissioner of Social Security*, the Court found that substantial evidence supported an ALJ's determination that claimant's symptoms were not severe, but, alternatively, stated that "[e]ven assuming the ALJ erred when he concluded [claimant's symptoms] were not severe impairments, that error was harmless because the ALJ considered all of his impairments in combination at later steps in the evaluation process." 420 Fed. Appx. 901, 903 (11th Cir. 2011). First, because this decision is unpublished, it is non-binding on this court. Second, even viewing this language as persuasive authority, this court is not convinced that it applies here. The Court made the harmless error ruling in *Burgin* as a mere alternative to the Court's primary holding that substantial evidence supported the ALJ's decision that the claimant's impairments were non-severe. *Id*. In the current case, not only is the ALJ's non-severe finding not supported by substantial evidence, but the ALJ directly contradicts himself on the same page of his own opinion. This court is unable to find such a blatant error harmless.

Likewise, in *Catuy v. Commissioner of Social Security Administration*, the Middle District of Florida found that substantial evidence supported the ALJ's non-severe finding, but that, regardless of this finding, the ALJ did not err because he had considered all of the claimant's impairments in later steps in the analysis. 8:11-cv-1196-T-MCR, 2012 WL 3264898, at *7 (M.D. Fla. Aug. 9, 2012). Again, this unpublished case mentions an alternative ruling that was unnecessary to the holding because the court had already confirmed the finding that the

impairment in question was non-severe.

The ALJ made a clear error in the current case that calls into question the care he took in his analysis of the other issues as well. The ALJ erroneously characterized and evaluated a moderate limitation as a mild limitation. The court cannot determine how much impact that erroneous finding had on his ultimate conclusion, but this error is sufficient to convince the court that the ALJ's determination is not supported by substantial evidence. For these reasons, the court REVERSES the ALJ's decision and REMANDS the case back to the SSA for further proceedings.

The court notes that claimant raised many other issues in her appeal that the court does not address here. Even within the severity analysis, the court does not address the question of whether claimant can permissibly bring in new evidence or whether the ALJ erred in failing to consider the records and opinions of Dr. Atkins. These matters are not relevant to the decision to reverse.

## VII. Conclusion

For the reasons stated, this court concludes that the decision of the Commissioner is not supported by substantial evidence and is to be REVERSED and REMANDED back to the SSA for further proceedings. The court will enter a separate order in accordance with this Memorandum Opinion.

DONE and ORDERED this 27th day of September, 2013.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE